UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

JTH TAX LLC, d/b/a LIBERTY TAX
SERVICE,

      Plaintiffs,

v.                                                      Civil Action No. 2:23-cv-0355

LOWENSKY CORTORREAL; RAMON
CORTORREAL; and THE EAGLES
TEAM LLC,

      Defendants.

## MEMORANDUM OPINION AND ORDER

Before the Court are three Motions to Dismiss the Complaint pursuant to the Federal Rules of Civil Procedure ("FRCP") 12(b)(1) and 12(b)(6) filed by Lowensky Cortorreal, ECF No. 12 ("L. Cortorreal Mot."), Ramon Cortorreal, ECF No. 11 ("R. Cortorreal Mot."), and The Eagles Team LLC (collectively, "Defendants"). ECF No. 10 ("The Eagles Team Mot.").[1] JTH Tax, d/b/a Liberty Tax Service ("Liberty" or "Plaintiff") filed three responses to Defendants' Motions. ECF Nos. 18, 19, 20. The Court has considered the parties' memoranda and this matter is ripe for judicial determination. For the reasons stated herein, Defendants' Motions to Dismiss is **GRANTED**.

---

[1] Each Defendants included a motion to dismiss pursuant to FRCP 12(b)(3) for improper venue. This case originated in the Northern District of Texas, Fort Worth Division, where the court only addressed and granted each Defendants Motion for improper venue and transferred the case because the franchise agreements at issue select the Commonwealth of Virginia as the governing law and the state or federal courts of Virginia as their jurisdiction and venue of choice. *See* Pl.'s Compl. Exs. A, B. Thus, the Court will not address improper venue as the agreements at issue are properly before this Court.

1

# I. FACTUAL AND PROCEDURAL HISTORY

Relevant to Defendants' Motions to Dismiss and stated in the light most favorable to Plaintiff, the following alleged facts are drawn from the Complaint and attachments thereto.

*Liberty Tax Service*

On February 17, 2023, Liberty, a Delaware limited liability company with its principal place of business in Hurst, Texas, filed a Complaint against Defendants, who all reside in Texas. ECF No. 1 ("Pl's Compl."). Liberty is a franchisor of Liberty Tax Service, an income tax preparation service whose centers are located throughout the United States. *Id.* ¶ 18. Liberty generates 90% of its annual revenue during the tax season, which runs from January to April. *Id.* ¶ 19. "Liberty owns numerous trade secrets and other confidential information, including but not limited to, client lists and files, methods of operation, private customer information, and marketing strategies[,] as well as their confidential Operations Manuals . . . ." (collectively, "Trade Secrets" and "Confidential Information"). *Id.* ¶ 20. According to the terms of the franchise agreements, Liberty discloses the Confidential Information and provides guidance to its franchisees. *Id.* ¶ 21.

*Lowensky Cortorreal's Franchise Agreements*

Around June 28, 2019, Liberty and Lowensky Cortorreal ("L. Cortorreal") entered into two franchise agreements for franchise territories TX016 ("TX016 Agreement") and TX728 ("TX728 Agreement") (collectively, the "Franchise Agreements"). *Id.* ¶¶ 22–23. "The Franchise Agreements each carried a five-year term." *Id.* ¶ 24. Allegedly, "L. Cortorreal personally guaranteed the Franchise Agreements." *Id.* ¶ 25. L. Cortorreal operated tax preparation offices at 2124 Holly Hall Street in Houston, TX, and 15881 FM 529 Road, Suite C, in Houston, TX. *Id.* ¶ 26. According to the Franchise Agreements, "Liberty granted L. Cortorreal a license to use its Trade Secrets and Confidential Information and to identify as a Liberty franchisee. Liberty also

provided L. Cortorreal with training in its operation, marketing, advertising, sales, and business systems." *Id.* ¶ 27. Liberty provided L. Cortorreal with "a copy of Liberty's confidential operating, marketing, and advertising materials, including its proprietary Operations Manual, which contains Liberty's Trade Secrets, which are not available to the public or to anyone who is not part of Liberty's business system." *Id.* "Section 1 of the Franchise Agreements gave L. Cortorreal a license to trade on Liberty's Confidential Information, proprietary tax system, trade names[,] and trademarks." *Id.* ¶ 28. L. Cortorreal agreed to pay Liberty monthly royalties and advertising fees in the amount of 19% of gross receipts and pay minimum royalties in the event of early, unilateral termination of the Franchise Agreements. *Id.* ¶¶ 29–30. Interest on all amounts L. Cortorreal owes Liberty compounds daily at a rate of 12% per annum. *Id.* ¶ 31.

"Under Section 9 of the Franchise Agreements, L. Cortorreal agreed to take the following actions immediately upon termination of the Franchise Agreements: (1) return Liberty's confidential Operations Manual; (2) cease using Liberty's Confidential Information; (3) pay all amounts due and owing to Liberty; and (4) adhere to all post-termination non-competition and non-solicitation covenants." *Id.* ¶ 32. Under Section 10(a) of the Franchise Agreements, L. Cortorreal agreed to not prepare income tax returns or offer financial products except during the term of the Franchise Agreements as a franchisee. *Id.* ¶33. Under Section 10(b) of the Franchise Agreements, L. Cortorreal agreed to not compete within the franchise territories or within twenty-five miles of the franchise territories for two years following the termination of the Franchise Agreements. *Id.* ¶ 34. Under Section 10(d) of the Franchise Agreements, L. Cortorreal agreed to not "solicit any person or entity served by any of his prior Liberty offices within the last twelve months that he [was] a Liberty franchisee for the purpose of offering income tax preparation or electronic filing of tax returns or financial products" for two years following the termination of the

Franchise Agreements. *Id.* ¶ 35. Allegedly, L. Cortorreal agreed to "not to do any act that is, in Liberty's determination, harmful, prejudicial or injurious to Liberty . . ." and agreed "that the provisions of Section 10 are reasonable, valid and not contrary to the public interest." *Id.* ¶¶ 36–37. Further, L. Cortorreal allegedly agreed to "waive all defenses to the strict enforcement of Section 10," and that "Liberty is entitled to a temporary restraining order, preliminary and/or permanent injunction for any breach of duties under . . . Sections 9 and 10." *Id.* ¶ 37.

The Franchise Agreements contain a liquidated damages provision where L. Cortorreal agreed to "pay the greater of (1) the total Gross Receipts during his last fiscal year operating as a Liberty franchisee or (2) total revenue received in breach of his non-competition obligations" if he violated the Franchise Agreements. *Id.* ¶ 38. Under the Franchise Agreements, L. Cortorreal agreed that any breach of "the non-compete provisions 'causes damage to the integrity of Liberty's franchised system, loss of franchisee and customer goodwill and irreparable harm.'" *Id.* ¶ 39. Under Section 12 of the Franchise Agreements, L. Cortorreal "acknowledged that he would use the Confidential Information only in connection with his Liberty franchises," and "to never use or disclose the Confidential Information following the termination of the Franchise Agreements." *Id.* ¶ 40. Allegedly, R. Cortorreal agreed to the same terms and conditions under the franchise agreements governing his operation as a Liberty franchisee. *Id.*

*The Promissory Notes at Issue*

On April 30, 2013, Richard Alamo and Roberto Melgar, non-parties and allegedly L. Cortorreal's former franchise partners, entered into a promissory note in favor of Liberty regarding the TX728 Franchise Agreement for $380,000.00 ("380K Note"). *Id.* ¶ 42. Allegedly, L. Cortorreal guaranteed the 380K Note, and Ramon Cortorreal ("R. Cortorreal") guaranteed $96,000.00 of the $380K Note "by way of an Accounts and Notes Receivable Guaranty dated May 21, 2013." *Id.* ¶¶

43–44. On November 6, 2013, Alamo and Melgar entered into a promissory note in favor of Liberty regarding the TX016 Franchise Agreement for $110,000.00 ("110K Note"), which L. Cortorreal allegedly personally guaranteed. *Id.* ¶¶ 45–46. On that same date, Alamo and Melgar entered into another promissory note in favor of Liberty regarding the TX728 Franchise Agreement for $10,000.00 ("10K Note"), which L. Cortorreal allegedly guaranteed. *Id.* ¶¶ 47–48.

On September 9, 2021, Alamo and Melgar entered a loan with MetaBank, NA ("Meta"), for $75,000.00 ("75K Note") for the TX728 franchise. *Id.* ¶¶ 50–51, 61. The 380K Note, 110K Note, 5K Note, and 75K Note are collectively referred to as "Notes." *Id.* ¶¶ 47–48. "Under the [75K] Note, 'in the event Liberty . . . makes any payment due and owing on this Note, Liberty shall stand in the place of Meta as to any events or circumstances in respect of which Meta may have any rights, claims or contentions . . . that arise out of this Note, including, but not limited to, the ability of Liberty to bring suit to collect all amounts it paid hereunder and collect its reasonable attorneys' fees.'" *Id.* ¶ 52. Allegedly, interest accrues at a rate of 12% per annum on the balance of the Notes. *Id.* ¶ 49. Allegedly, Liberty paid $44,124.34, which is the balance of the Meta loan on January 24, 2022. *Id.* ¶53. Allegedly, Alamo, Melgar, and L. Cortorreal have failed to pay the principal balances and accrued interest on the Notes. *Id.* ¶ 54.

*Termination of the Franchise Agreements*

On January 23, 2022, Liberty sent a termination notice to Alamo and Melgar terminating the Franchise Agreements after learning L. Cortorreal breached the Franchise Agreements. *Id.* ¶ 55, Ex. H. Since Liberty terminated the Franchise Agreements "approximately 2.5 years prior to their natural expiration, L. Cortorreal is obligated to pay minimum royalties in the amount of $33,000, pursuant to Section 4(d)(iii) of the Franchise Agreements." *Id.* ¶ 56. The termination notice did not impact any debts L. Cortorreal owes Liberty. *Id.* ¶ 57.

*Post-Termination Breaches of Contract and Violations of Law and Statute*

L. Cortorreal and R. Cortorreal began operating The Eagles Team LLC ("The Eagles Team"), a business that offers tax preparation services similar to Liberty's after Liberty terminated the Franchise Agreements. *Id.* ¶ 58. Allegedly, "L. Cortorreal and R. Cortorreal are using Liberty's Confidential Information to solicit Liberty's customers on behalf of The Eagles Team. One such way is via text message[] stating, 'We are contacting you from The Eagles Team! We are happy to inform you we have separated from Liberty Tax Service[,] where you used to file your income tax. We are the same preparers with the same great customer service as always, with a new name and address.'" *Id.* ¶ 59. Additionally, Liberty's former client submitted a Google Review of The Eagles Team demonstrating L. Cortorreal is providing tax preparation services to Liberty's former clients. *Id.* ¶ 60.

Liberty retained a private investigator to surveil The Eagles Team on February 14, 2023, and discovered that The Eagles Team is located directly across from Alamo, Melgar, and L. Cortorreal's terminated Liberty's TX728 franchise. *Id.* ¶ 61. According to Liberty, L. Cortorreal and R. Cortorreal have tortiously interfered with the Franchise Agreements, have disclosed Liberty's Confidential Information to R. Cortorreal and The Eagles Team, are using Liberty's Confidential Information to compete with Liberty, sown confusion into the minds of Liberty's clients, and has failed to pay incurred debts in connection with the Franchise Agreements of at least $100,000. *Id.* ¶¶ 62–67. Specifically, Plaintiff asserts six counts against Defendants:

    Count 1.    Breach of Contract (Equitable Claim) (Against Defendant L. Cortorreal) (*Id.* ¶¶ 69–78);

    Count 2.    Breach of the Franchise Agreements (Monetary Claim) (Against Defendant L. Cortorreal) (*Id.* ¶¶ 79–86);

Count 3. Violation of the Defend Trade Secrets Act of 2016 (Against All Defendants) (*Id.* ¶¶ 87–100);

Count 4. Unjust Enrichment (Against All Defendants) (*Id.* ¶¶ 101–08);

Count 5. Conversion (Against All Defendants) (*Id.* ¶¶ 109–17);

Count 6. Tortious Interference with Franchise Agreements and Business Relationships (Against Defendants R. Cortorreal and The Eagles Team) (*Id.* ¶¶ 118–25).

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of actions that fail to state a claim upon which relief can be granted. Considering a Rule 12(b)(6) motion, courts may only rely upon the complaint's allegations and those documents attached as exhibits or incorporated by reference. *See Simons v. Montgomery Cnty. Police Officers*, 762 F.2d 30, 31 (4th Cir. 1985). Courts will favorably construe the allegations of the complainant and assume that the facts alleged in the complaint are true. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). However, a court "need not accept the legal conclusions drawn from the facts," nor "accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Eastern Shore Mkts., Inc., v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000).

A complaint need not contain "detailed factual allegations" to survive a motion to dismiss, but the complaint must incorporate "enough facts to state a belief that is plausible on its face." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008). This plausibility standard does not equate to a probability requirement, but it entails more than a mere possibility that a defendant has acted unlawfully. *Ashcroft v. Iqbal*, 556 U.S. 662, 677–79 (2009). Accordingly, the plausibility standard requires a plaintiff to articulate facts that, when accepted as true, demonstrate that the plaintiff has stated a claim that makes it

7

plausible he is entitled to relief. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 677, and *Twombly*, 550 U.S. at 557). To achieve factual plausibility, plaintiffs must allege more than "naked assertions . . . without some further factual enhancement." *Twombly*, 550 U.S. at 557. Otherwise, the complaint will "stop[ ] short of the line between possibility and plausibility of entitlement to relief." *Id.*

### III. DISCUSSION

Under Rule 12(b)(6), Defendants each move to dismiss all counts in the Complaint for failure to state a claim upon which relief can be granted. ECF Nos. 10, 11, 12. The Court will first determine whether Plaintiff has stated a claim for relief in Count Three because it is the only claim qualifying for federal question jurisdiction. If Plaintiff has stated a claim, the Court will determine whether it would exercise its discretion to consider supplemental jurisdiction over the state claims.

#### A. Subject Matter Jurisdiction

As an initial matter, a federal district court has jurisdiction to hear cases arising under the laws of the United States. U.S. Const. art. III, § 2. Title 28 U.S.C. § 1331, states, "district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." "In the 'vast majority of cases,' that means suits 'in which federal law creates the cause of action.'" *Burrell v. Bayer Corp.*, 918 F.3d 372, 380 (4th Cir. 2019) (internal citation omitted). The federal question must be necessarily raised, actually disputed, and substantial to the federal system as a whole. *Id.* (internal citations omitted). Here, the Plaintiff has alleged subject matter jurisdiction based on a federal question because Plaintiff's claim under Count Three arises under the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836. Therefore, the Court has sufficient basis for federal question jurisdiction and will address the federal claim first.

## B. Count Three— Violation of the Defend Trade Secrets Act of 2016 (Against All Defendants)

Plaintiff's claim in Count Three alleges violations of the Defend Trade Secrets Act ("DTSA") against L. Cortorreal, R. Cortorreal, and The Eagles Team. Plaintiff alleges that "Liberty owns numerous trade secrets that implicate interstate commerce, including but not limited to, client lists and files, as well as its confidential Operations Manual, which contains Liberty's highly valuable and guarded Trade Secrets and Confidential Information." Pl.'s Compl. ¶ 89. Plaintiff asserts that its Trade Secrets derive independent economic value and are not readily ascertainable as they are disclosed only to its franchisees. *Id.* ¶¶ 90–91. Only Liberty's franchisees are licensed to use the Trade Secrets, which Liberty disclosed to L. Cortorreal. *Id.* ¶¶ 92–93. Further, Plaintiff asserts that it has taken preventative measures to protect and preserve the Trade Secrets, including:

> (a) requiring franchisees to agree to never use the Trade Secrets for any purpose other than operating a Liberty franchise; (b) requiring franchisees to return the confidential Operations Manual and deliver the Trade Secrets and Confidential Information to Liberty immediately upon termination or expiration of the Franchise Agreements; and (c) enforcing Liberty's interest in the Trade Secrets by initiating legal recourse against those who misappropriate the Trade Secrets.

*Id.* ¶ 94. Plaintiff contends "L. Cortorreal agreed under the Termination Agreements to never use, disclose, or permit the use or disclosure of Liberty's Trade Secrets and Confidential Information" and would return this information to Liberty upon termination of the Franchise Agreements. *Id.* ¶ 95.

Additionally, Plaintiff asserts that L. Cortorrreal intentionally and without Liberty's consent used or disclosed Liberty's Trade Secrets to R. Cortorreal and The Eagles Team. *Id.* ¶ 96–97. Further, Defendants have used Liberty's Trade Secrets without Liberty's consent, causing irreparable injury. *Id.* The Eagles Team argues Plaintiff's allegations that Defendants have

9

misappropriated Plaintiff's Trade Secrets are speculative, and Plaintiff has not alleged Defendants are using its Trade Secrets in interstate commerce. The Eagles Team Mot. at 2–3. L. Cortorreal and R. Cortorreal restate the same arguments as The Eagles Team. *See* R. Cortorreal Mot. at 2–3; *see also* L. Cortorreal Mot. at 2–3.

Under the DTSA, "[a]n owner of a trade secret that is misappropriated may bring a civil action . . . if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836. The DTSA defines trade secret as "all forms and types of financial, business, scientific, technical, economic, or engineering information" that the owner "has taken reasonable measures to keep such information secret" and derives independent economic value. 18 U.S.C. § 1839(3). Thus, Plaintiff must allege: (1) it owns a trade secret; (2) the trade secret was misappropriated; and (3) the trade secret implicates interstate or foreign commerce. *Space Sys./Loral, LLC v. Orbital ATK, Inc.*, 306 F. Supp. 3d 845, 853 (E.D. Va. 2018).

Upon review of the alleged facts, the Court finds that Plaintiff fails to plead a cause of action under the DTSA, specifically the existence of a trade secret and a nexus to interstate commerce. In analyzing Plaintiff's allegations, it is instructive for the Court to look at cases where courts found that the plaintiff sufficiently pleaded a cause of action under the DTSA.

In *Space Systems/Loral, LLC v. Orbital ATK, Inc.*, the court first found that the plaintiff provided "factual descriptions of the breached documents[,] including their relation to its technological development for robotic satellite assembly, system engineering, and research and development." *Id.* at 853. Additionally, the plaintiff made reasonable efforts to mark and label the highly sensitive nature of the materials and derived independent economic value from the materials because they contained information such as financial data and business plans. *Id.* Second, the court

found the defendant improperly obtained the plaintiff's trade secrets through a data breach that contained "highly sensitive, confidential, and proprietary information, files, documents, and data." *Id.* at 854 (internal quotations omitted). Last, the court found that the trade secrets are used in interstate and foreign commerce "because it contains business plans, procurement strategies[,] and subcontractor and vendor relationships." *Id.*

In *Philips North America LLC v. Hayes*, the plaintiff alleged that the "MR equipment manufacturing information, national product supply funnel information, business and strategic plans [for 2019 and 2020], marketing, account strategies, pricing, national orders and sales, and relationships with[] customers and clients" are trade secrets. No. CV ELH-20-1409, 2020 WL 5407796, at *8 (D. Md. Sept. 9, 2020). First, the court found that the records the defendant had in his possession were trade secrets because the plaintiff took steps to keep the records a secret and derived independent economic value from the records in its business industry. *Id.* at *9. Second, the court found the plaintiff's allegations of the defendant "access[ing], download[ing], and print[ing] [the plaintiff's] confidential documents after accepting a job offer" was sufficient to constitute misappropriation. *Id.* at *10. Last, the court found the plaintiff met the interstate or foreign commerce element because the plaintiff's sales business is both national and international. *Id.* at *11.

Lastly, in *Hawkins v. Fishbeck*, the plaintiff alleged that its trade secrets fall within the definition of scientific and technical information as they include "software design specifications, . . . product engineering and architecture, system prototypes, . . . [and] user interface design", and took reasonable steps to keep this information a secret. 301 F. Supp. 3d 650, 657 (W.D. Va. 2017). First, the court found that the plaintiff sufficiently described "various facets of the software and related products" to support that its products are trade secrets and derived economic value from

11

the trade secrets including "pricing and service delivery planning and decisions . . . and work in progress with outside software development firms . . . ." *Id.* Second, the court found the plaintiff's allegations of the defendant receiving and possessing the trade secrets "knowing them to be misappropriated and converted without authorization" was sufficient to constitute misappropriation. *Id.* at 658. Last, the court found the plaintiff met the interstate or foreign commerce element in its amended complaint because the plaintiff's trade secrets "discuss[] marketing plans and feedback from potential customers, and business with outside developers." *Id.* In sum, these cases allege, with requisite specificity, a cause of action under the DTSA.

However, in *Lithero, LLC v. AstraZeneca Pharmaceuticals LP*, the plaintiff alleged that its trade secrets included "highly confidential and proprietary information regarding years of past research and development, the current capabilities of LARA coming as a result of that research and development, and detailed plans for future areas of growth." No. CV 19-2320-RGA, 2020 WL 4699041, at *2 (D. Del. Aug. 13, 2020) (internal quotations omitted). The court found the plaintiff failed to meet the first element under the DTSA because the plaintiff's complaint "points to large, general areas of information that [the] [p]laintiff alleges to have shared with the [d]efendant, but does not identify what the trade secrets are within those general areas." *Id.* Additionally, in *Mid-Atlantic Field Services LLC v. Barfield*, the plaintiff alleged that "Mid-Atlantic conducts business, performs projects, and has customers primarily throughout Virginia." No. 3:23-CV-177-HEH, 2023 WL 4494175, at *4 n.5 (E.D. Va. July 12, 2023) (internal quotations omitted). The court found that the plaintiff failed to meet the third element under the DTSA because the plaintiff's allegations were conclusory and lacked any supporting evidence. In sum, these cases fail to allege, with requisite specificity, a cause of action under the DTSA.

Here, Plaintiff restates throughout the Complaint that the following list of materials allegedly are trade secrets: "client lists and files, methods of operation, private customer information, and marketing strategies as well as their confidential Operations Manuals." Pl.'s Compl. ¶¶ 20, 27, 76, 89–97. In these paragraphs, Plaintiff merely states that this list of materials are trade secrets but never describes or explains the materials and how Liberty derives economic value from them. Liberty instead stresses the measures it has taken to protect and preserve its Trade Secrets. Although client lists and marketing strategies are considered trade secrets under the DTSA,[2] a plaintiff seeking statutory protection must allege specific factual detail about the nature of these materials, including their development and why competitors cannot readily ascertain the client lists. *See Art & Cook, Inc. v. Haber*, 416 F. Supp. 3d 191, 196 (E.D.N.Y. 2017). Consequently, Plaintiff has not provided the Court with this information, yet instead, provided the Court with naked conclusory assertions without any support.

Additionally, Plaintiff fails to allege a nexus between interstate or foreign commerce and the alleged trade secret. Plaintiff states, "Liberty owns numerous Trade Secrets that implicate interstate commerce . . . ." Pl.'s Compl. ¶ 89. This statement alone is deficient and lacks any supporting evidence to allege a nexus between interstate or foreign commerce. In an attempt to cure this deficiency, Plaintiff's Response includes the allegation that "tax return preparation and filing implicates interstates commerce, as tax returns are transmitted from where they are prepared (in this case, Texas) to the IRS, which is located in Washington, DC."[3] However, this statement is inadequate as Plaintiff cannot cure its pleading deficiencies with later-filed documentation. *See U.S. ex rel. Nathan v. Takeda Pharms. N. Am., Inc.*, 707 F.3d 451, 458–59 n.8 (4th Cir. 2013)

---

[2] *See Albert S. Smyth Co. v. Motes*, No. CV CCB-17-677, 2018 WL 3635024, at *4 (D. Md. July 31, 2018) (finding that customer records and lists are trade secrets).
[3] *See* ECF No. 18 at 6 n.3 ("Pl.'s Resp. to The Eagles Team Mot."); ECF No. 19 at 6 n.2 ("Pl.'s Resp. to L. Cortorreal Mot."); ECF No. 20 at 10–11 ("Pl.'s Resp. to R. Cortorreal Mot.").


(stating that a "plaintiff cannot cure pleading deficiencies in the . . . complaint with later-filed supporting documentation on a motion to dismiss."). Thus, the Court grants Defendants' Motions to Dismiss Count Three.

### C. Supplemental Jurisdiction

In cases where district courts have original jurisdiction, "the district courts shall have supplemental jurisdiction over all other claims that are so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). According to the Supreme Court, "once a district court had valid jurisdiction over a federal claim, it could, in its discretion, exercise supplemental jurisdiction over additional state claims if they arose out of 'a common nucleus of operative fact' such that the plaintiff would ordinarily be expected to try the claims in one judicial proceeding." *White v. Cnty. of Newberry, S.C.*, 985 F.2d 168, 171 (4th Cir. 1993); *see also United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966). However, district courts may decline to exercise supplemental jurisdiction if "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C.A. § 1367(c)(3).

Plaintiff brings forth the following state law claims: Count One, alleging breach of contract; Count Two, alleging breach of the Franchise Agreements; Count Four, alleging unjust enrichment; Count Five, alleging conversion; and Count Six alleging tortious interference. Here, the Court has dismissed the only federal claim over which the Court has original jurisdiction. Thus, the Court will exercise its discretion not to address the state law claims Plaintiff brought.

## III. CONCLUSION

Based on the foregoing reasons, the Defendants' Motions to Dismiss Count Three are **GRANTED.** ECF Nos. 10, 11, 12. The Court hereby **GRANTS** Plaintiff leave to file an amended complaint within **FIFTEEN (15) DAYS** of the date of this Order.

The Court **DIRECTS** the Clerk to provide a copy of this Order to the parties.

**IT IS SO ORDERED.**

Norfolk, Virginia
March _1_ , 2024

Raymond A. Jackson
United States District Judge