UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

JTH TAX LLC, d/b/a LIBERTY TAX
SERVICE,

        Plaintiffs,

    v.                               Civil Action No. 2:23-cv-0355

LOWENSKY CORTORREAL; RAMON
CORTORREAL; and THE EAGLES
TEAM LLC,

        Defendants.

## MEMORANDUM OPINION AND ORDER

Before the Court are three Motions to Dismiss the Amended Complaint pursuant to the Federal Rules of Civil Procedure ("FRCP") 12(b)(1) and 12(b)(6) filed by Ramon Cortorreal, ECF No. 42 ("R. Cortorreal Mot."), Lowensky Cortorreal, ECF No. 43 ("L. Cortorreal Mot."), and The Eagles Team LLC (collectively, "Defendants"). ECF No. 44 ("The Eagles Team Mot."). Defendants each filed a Memorandum in Support of the Motion. ECF Nos. 45, 46, 47. JTH Tax, d/b/a Liberty Tax Service ("Liberty" or "Plaintiff") filed a consolidated response to Defendants' Motions. ECF No. 48 ("Pl.'s Resp."). The Court has considered the parties' memoranda and this matter is ripe for judicial determination. For the reasons stated herein, Defendants' Motions to Dismiss are **GRANTED IN PART and DENIED IN PART**.

## I. FACTUAL AND PROCEDURAL HISTORY

On February 17, 2023, Plaintiff filed a Complaint alleging unlawful competition and breach of the franchise agreements. ECF No. 1. On March 29, 2023, Defendants filed three motions to dismiss for improper venue and lack of subject matter jurisdiction under the Defend Trade

1

Secrets Act of 2016, 18 U.S.C. § 1836 ("DTSA"). ECF Nos. 10, 11, 12. On July 20, 2023, Judge

Pittman of the United States District Court for the Northern District of Texas issued an Opinion

and Order granting in part Defendants' motions to dismiss for improper venue and transferred this

case to this Court. ECF No. 24.[1] On March 1, 2024, the Court granted Defendants' motions to

dismiss for lack of subject matter jurisdiction under the DTSA and granted Plaintiff leave to

amend. ECF No. 39. Relevant to Defendants' Motions to Dismiss and stated in the light most

favorable to Plaintiff, the following alleged facts are drawn from the Amended Complaint and

attachments thereto.

*Liberty Tax Service*

On March 18, 2024, Liberty, a Delaware limited liability company with its principal place

of business in Hurst, Texas, filed an Amended Complaint against Defendants, who all reside in

Texas. ECF No. 40 ("Am. Compl."). Liberty is a franchisor of Liberty Tax Service, an income tax

preparation service whose centers are located throughout the United States. *Id.* ¶ 17. Liberty

generates 90% of its annual revenue during the tax season, which runs from January to April each

year. *Id.* ¶ 18. "Liberty has invested substantial time and money developing and promoting the

distinctive and well-known Liberty Tax Service system, which sells income tax preparation

services and products to the public under Liberty's trademarks." *Id.* ¶ 19. Liberty grants a limited

license to its franchisees "to identify as Liberty franchisees and use Liberty's highly guarded and

valuable confidential information and trade secrets." *Id.* ¶ 20. This includes "customer lists,

customer files, private customer information (such as names, phone numbers, social security

numbers and other tax return and financial information), operational methods, promotional plans,

marketing strategies, pricing structures, business strategies, training material and other proprietary

---

[1] In the Opinion and Order, Judge Pittman exercised discretion not to resolve the issue of subject matter jurisdiction in the interest of justice. ECF No. 24.

trade secrets and know-how, including its Operations Manual . . . ." (collectively, "Trade Secrets" and "Confidential Information"). *Id.* Additionally, "Liberty's franchisees pay monthly [royalties] and advertising fees and agree to various in-term and post-termination obligations." *Id.* ¶ 21.

*Lowensky Cortorreal's Franchise Agreements*

Lowensky Cortorreal ("L. Cortorreal") is a former Liberty franchisee. *Id.* ¶ 22. Around June 28, 2019, Liberty and L. Cortorreal entered into two franchise agreements for franchise territories TX016 ("TX016 Agreement") and TX728 ("TX728 Agreement") (collectively, the "Franchise Agreements"). *Id.* ¶¶ 23–24. Each franchise agreement carried a five-year term. *Id.* ¶ 25. Allegedly, "L. Cortorreal personally guaranteed the Franchise Agreements." *Id.* ¶ 26. L. Cortorreal operated tax preparation offices at 2124 Holly Hall Street in Houston, Texas, and 15881 FM 529 Road, Suite C, in Houston, Texas. *Id.* ¶ 27. According to the Franchise Agreements, L. Cortorreal had "a license to use Liberty's Confidential Information and to identify as a Liberty franchisee." *Id.* ¶ 28. "Liberty also provided L. Cortorreal with training in its operation, marketing, advertising, sales, and business systems." *Id.* Liberty also provided L. Cortorreal with a copy of its "confidential operating, marketing, and advertising materials, including its proprietary Operations Manual, which contains Liberty's operational methods, promotional plans, marketing strategies, pricing structures, business strategies, training material and other proprietary trade secrets and know-how, which are not available to the public or to anyone who is not part of [the] business." *Id.*

Under Section 1 of the Franchise Agreements, L. Cortorreal had a "license to trade on Liberty's Confidential Information, proprietary tax system, trade names[,] and trademarks." *Id.* ¶ 29. L. Cortorreal agreed to pay Liberty monthly royalties and advertising fees in the amount of 19% of gross receipts and pay minimum royalties in the event of early, unilateral termination of

3

the Franchise Agreements. *Id.* ¶¶ 30–31. Interest on all amounts L. Cortorreal owes Liberty compounds daily at a rate of 12% per annum. *Id.* ¶ 32. According to the Franchise Agreements, L. Cortorreal agreed to "return Liberty's customer lists and Operations Manual and all updates, and adhere to the Franchise Agreements' post-termination non-competition and non-solicitation covenants set forth in Sections 10(b) and 10(d)." *Id.* ¶ 33. Allegedly, L. Cortorreal agreed to not compete with Liberty within twenty-five miles of the boundaries of the franchise territories for two years following termination. *Id.* On January 23, 2022, Liberty terminated the Franchise Agreements and L. Cortorreal never returned Liberty's confidential Operations Manual. *Id.*

Under Section 9 of the Franchise Agreements, L. Cortorreal agreed to: "(1) return Liberty's confidential Operations Manual; (2) cease using Liberty's Confidential Information; (3) pay all amounts due and owing to Liberty; and (4) adhere to all post-termination non-competition and non-solicitation covenants" immediately upon termination. *Id.* ¶ 34. According to Section 10(a) of the Franchise Agreements, L. Cortorreal agreed to not "prepare or transmit income tax returns or offer financial products except in his capacity as a Liberty franchisee." *Id.* ¶ 35. Additionally, L. Cortorreal agreed "he would not directly or indirectly solicit any person or entity served by any of his prior Liberty offices within the last twelve months that he [was] a Liberty franchisee for the purpose of offering income tax preparation or electronic filing of tax returns or financial products" for two years upon termination of the Franchise Agreements. *Id.* ¶ 37. "L. Cortorreal also agreed under each of the Franchise Agreements not to do any act that is, in Liberty's determination, harmful, prejudicial or injurious to Liberty . . . ." *Id.* ¶ 38 (internal quotation and citation omitted). L. Cortorreal allegedly agreed that the Section 10 provisions are "reasonable, valid and not contrary to the public interest" and to "waive all defenses to the strict enforcement of Section 10." *Id.* ¶ 39. Further, L. Cortorreal allegedly agreed that under Sections 9 and 10 of the Franchise

4

Agreements, Liberty is entitled to a temporary restraining order, preliminary and/or permanent injunction for any breach of duties. *Id.*

The Franchise Agreements contain a liquidated damages provision where L. Cortorreal agreed to "pay the greater of (1) the total Gross Receipts during his last fiscal year operating as a Liberty franchisee or (2) total revenue received in breach of his non-competition obligations" if he violated the Franchise Agreements. *Id.* ¶ 40. Under the Franchise Agreements, L. Cortorreal agreed that any breach of "the non-compete provisions causes damage to the integrity of Liberty's franchised system, loss of franchisee and customer goodwill and irreparable harm." *Id.* ¶ 41 (internal citation and quotation marks omitted). Under Section 12 of the Franchise Agreements, L. Cortorreal "acknowledged that he would use the Confidential Information only in connection with his Liberty franchises," and "to never use or disclose the Confidential Information following the termination of the Franchise Agreements." *Id.* ¶ 42. Allegedly, Ramon Cortorreal ("R. Cortorreal") agreed to the same terms and conditions under the franchise agreements governing his operation as a Liberty franchisee. *Id.*

*The Promissory Notes at Issue*

On April 30, 2013, Richard Alamo and Roberto Melgar, non-parties and allegedly L. Cortorreal's former franchise partners, entered into a promissory note in favor of Liberty regarding the TX728 Franchise Agreement for $380,000.00 ("380K Note"). *Id.* ¶ 44. On November 15, 2019, the 380K Note was amended. *Id.* Allegedly, L. Cortorreal guaranteed the 380K Note, and R. Cortorreal guaranteed $96,000.00 of the $380K Note. *Id.* ¶¶ 45–46. On November 6, 2013, Alamo and Melgar entered into a promissory note in favor of Liberty regarding the TX016 Franchise Agreement for $110,000.00 ("110K Note"), which L. Cortorreal allegedly personally guaranteed. *Id.* ¶¶ 47–48. On that same date, Alamo and Melgar entered into another promissory note in favor

5

of Liberty regarding the TX728 Franchise Agreement for $10,000.00 ("10K Note"), $5,000.00 ("5K Note") of which was payable in connection with the TX728 franchise. *Id.* ¶ 49. L. Cortorreal allegedly guaranteed the 5K Note. *Id.* ¶ 50.

On September 9, 2021, Alamo and Melgar entered into a loan with MetaBank, NA ("Meta"), for $75,000.00 ("75K Note") for the TX728 franchise. *Id.* ¶¶52–53. The 380K Note, 110K Note, 5K Note, and 75K Note are collectively referred to as "Notes." *Id.* ¶¶ 49. "Under the [75K] Note, Liberty shall stand in the place of Meta [regarding]. . . any rights, claims or contentions . . . that arise out of this Note, including, but not limited to, the ability of Liberty to bring suit to collect all amounts it paid hereunder and collect its reasonable attorneys' fees." *Id.* ¶ 54 (internal citation and quotation omitted). Allegedly, interest accrues at a rate of 12% per annum on the balance of the Notes. *Id.* ¶ 51. On January 24, 2022, Liberty paid $44,124.34, which is the balance of the Meta loan. *Id.* ¶55. Allegedly, Alamo, Melgar, and L. Cortorreal have failed to pay the principal balances and accrued interest on the Notes. *Id.* ¶ 56.

*Termination of the Franchise Agreements*

On January 23, 2022, Liberty sent a termination notice to Alamo and Melgar, terminating the Franchise Agreements after learning L. Cortorreal breached the Franchise Agreements. *Id.* ¶ 57, Ex. H. Since Liberty terminated the Franchise Agreements "approximately 2.5 years prior to their natural expiration, L. Cortorreal is obligated to pay minimum royalties in the amount of $33,000." *Id.* ¶ 58. The termination notice did not impact any debts L. Cortorreal owes Liberty. *Id.* ¶ 59.

*Post-Termination Breaches of Contract and Violations of Law and Statute*

L. Cortorreal and R. Cortorreal, L. Cortorreal's father, began operating The Eagles Team LLC ("The Eagles Team"), a business that offers tax preparation services similar to Liberty's, after

Liberty terminated the Franchise Agreements. *Id.* ¶ 60. L. Cortorreal and R. Cortorreal are directly competing with Liberty "within the restricted zone, and soliciting Liberty's customers, all while using Liberty's Confidential Information to accomplish these goals." *Id.* One way L. Cortorreal and R. Cortorreal are soliciting Liberty's customers on behalf of The Eagles Team is through text messages stating, "We are contacting you from The Eagles Team! We are happy to inform you [that] we have separated from Liberty Tax Service[,] where you used to file your income tax[es]. We are the same preparers with the same great customer service as always, with a new name and address . . . .'" *Id.* ¶ 61. Additionally, Liberty's former client submitted a Google Review of The Eagles Team demonstrating L. Cortorreal is providing tax preparation services to Liberty's former clients. *Id.* ¶ 62. Liberty hired a private investigator to surveil The Eagles Team on February 14, 2023. *Id.* ¶ 63. The investigator uncovered that The Eagles Team is located across the street from the Liberty TX728 office. *Id.* Accordingly, Liberty asserts six counts against Defendants:

Count 1.   Breach of Contract (Equitable Claim) (Against Defendant L. Cortorreal) (*Id.* ¶¶ 71–80);

Count 2.   Breach of the Franchise Agreements (Monetary Claim) (Against Defendant L. Cortorreal) (*Id.* ¶¶ 81–88);

Count 3.   Violation of the Defend Trade Secrets Act of 2016 (Against All Defendants) (*Id.* ¶¶ 89–106);

Count 4.   Unjust Enrichment (Against All Defendants) (*Id.* ¶¶ 107–14);

Count 5.   Conversion (Against All Defendants) (*Id.* ¶¶ 115–23);

Count 6.   Tortious Interference with Franchise Agreements and Business Relationships (Against Defendants R. Cortorreal and The Eagles Team) (*Id.* ¶¶ 124–31).

7

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of actions that fail to state a claim upon which relief can be granted.  Considering a Rule 12(b)(6) motion, courts may only rely upon the complaint's allegations and those documents attached as exhibits or incorporated by reference. *See Simons v. Montgomery Cnty. Police Officers*, 762 F.2d 30, 31 (4th Cir. 1985). Courts will favorably construe the allegations of the complainant and assume that the facts alleged in the complaint are true. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). However, a court "need not accept the legal conclusions drawn from the facts," nor "accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Eastern Shore Mkts., Inc., v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000).

A complaint need not contain "detailed factual allegations" to survive a motion to dismiss, but the complaint must incorporate "enough facts to state a belief that is plausible on its face." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008). This plausibility standard does not equate to a probability requirement, but it entails more than a mere possibility that a defendant has acted unlawfully. *Ashcroft v. Iqbal*, 556 U.S. 662, 677–79 (2009). Accordingly, the plausibility standard requires a plaintiff to articulate facts that, when accepted as true, demonstrate that the plaintiff has stated a claim that makes it plausible he is entitled to relief. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 677, and *Twombly*, 550 U.S. at 557). To achieve factual plausibility, plaintiffs must allege more than "naked assertions . . . without some further factual enhancement." *Twombly*, 550 U.S. at 557. Otherwise, the complaint will "stop[ ] short of the line between possibility and plausibility of entitlement to relief." *Id.*

8

## III. DISCUSSION

Under Rule 12(b)(1) and (6), Defendants move to dismiss all counts in the Complaint for lack of subject matter jurisdiction and failure to state a claim upon which relief can be granted. ECF Nos. 42, 43, 44. If the Court has subject matter jurisdiction and Plaintiff states a claim under the DTSA, then the Court will decide whether to exercise supplemental jurisdiction over the state law claims.

### A. Subject Matter Jurisdiction

As an initial matter, a federal district court has jurisdiction to hear cases arising under the laws of the United States. U.S. Const. art. III, § 2. Title 28 U.S.C. § 1331, states, "district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." "In the 'vast majority of cases,' that means suits 'in which federal law creates the cause of action.'" *Burrell v. Bayer Corp.*, 918 F.3d 372, 380 (4th Cir. 2019) (internal citation omitted). The federal question must be necessarily raised, actually disputed, and substantial to the federal system as a whole. *Id.* (internal citations omitted). Here, the Plaintiff has alleged subject matter jurisdiction based on a federal question because Plaintiff's claim under Count Three arises under the DTSA. However, Defendants allege that the Court lacks jurisdiction because of the stay imposed in a separate bankruptcy proceeding against Plaintiff. ECF Nos. 45 ("R. Cortorreal Mem. Supp."), 46 (L. Cortorreal Mem. Supp."), 47 ("The Eagles Team Mem. Supp."). Therefore, the Court has sufficient basis for federal question jurisdiction and will address the bankruptcy stay first and then the federal claim.

### i. Liberty Chapter 15 Bankruptcy

Defendants argue that this Court lacks subject matter jurisdiction because Liberty's claims are the property of the bankruptcy estate. R. Cortorreal Mem. Supp. at 1–3; L. Cortorreal Mem.

9

Supp. at 1–3; The Eagles Team Mem. Supp. at 1–3. Additionally, the stay imposed in the bankruptcy case would prevent Defendants from raising counterclaims. *Id.* Specifically, Defendants argue JTH Tax obtained an initial order on July 25, 2023, under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, in a proceeding before the Supreme Court of British Columbia. *Id.* In the initial order from the Supreme Court of British Columbia, no action or suit against JTH Tax can be commenced without "the written consent of JTH Tax, LLC, or the monitor appointed in the proceedings or with leave of the Supreme Court of British Columbia." *Id.* On July 26, 2023, NextPoint Financial Inc., the duly appointed foreign representative of JTH Tax, filed a petition under Chapter 15 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). *Id.* Following a hearing held on July 27, 2023, the Bankruptcy Court entered an order granting provisional relief pursuant to 11 U.S.C. § 1519 of the Bankruptcy Code and extending the stay granted by the initial order in the Canadian proceeding. *Id.* On August 16, 2023, the Bankruptcy Court issued a final Recognition Order recognizing the Canadian proceedings and granted all relief authorized by 11 U.S.C. § 1520, including the automatic stay authorized by 11 U.S.C. § 362 until the Chapter 15 proceedings conclude. *Id.*; *see also* Am. Compl. Ex. B at 4. Plaintiff argues that nothing in the Recognition Order or Bankruptcy Code prohibits Liberty from asserting claims against Defendants. Pl.'s Resp. at 10. Additionally, Plaintiff argues that the Defendants' potential counterclaims being subject to the automatic stay does not require dismissal of the action. *Id.* at 11.

Under 11 U.S.C. § 1520(a)(1), "[u]pon recognition of a foreign proceeding that is a foreign main proceeding sections 361 and 362 apply with respect to the debtor and the property of the debtor that is within the territorial jurisdiction of the United States." Section 362 of the Bankruptcy Code "operates as a stay, applicable to all entities, of . . . the commencement or

continuation . . . of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title." 11 U.S.C. § 362(a)(1). The automatic stay takes effect upon filing for bankruptcy. "The purpose of the automatic stay, in addition to protecting the relative position of creditors, is to shield the debtor from financial pressure during the pendency of the bankruptcy proceeding." *Winters By & Through McMahon v. George Mason Bank*, 94 F.3d 130, 133 (4th Cir. 1996). However, the automatic stay protections are not intended to reach claims brought by debtors. *See, e.g.*, *Carley Cap. Grp. v. Fireman's Fund Ins. Co.*, 889 F.2d 1126, 1127 (D.C. Cir. 1989) (holding Section 362 "'by its terms only stays proceedings *against* the debtor,' and 'does not address actions brought *by* the debtor which would inure to the benefit of the bankruptcy estate.'").

Here, the plain language of the Bankruptcy Code Section 362 prohibits "actions or proceedings *against* the debtor." Considering the plain unambiguous language, the statue could hardly be read any other way. Nevertheless, the automatic stay does not apply because Plaintiff is the debtor who initiated this proceeding. Now, if Defendant plans to assert any counterclaims against Plaintiff, then those claims would be subject to the automatic stay because that would be an action or proceeding against the debtor. *Cf. Koolik v. Markowitz*, 40 F.3d 567, 568 (2d Cir. 1994) ("an answer that asserts a counterclaim against a plaintiff who becomes a bankruptcy debtor is an 'action or proceeding against the debtor' within the meaning of § 362(a)(1), notwithstanding the fact that the plaintiff initiated the lawsuit."). Additionally, staying Defendants' potential counterclaims does not impact this case and does not require dismissal. Thus, this Court has subject matter jurisdiction over this proceeding and it would not be a waste of judicial resources to do so.[2]

---

[2] Defendants raise in their reply brief that Plaintiff lacks standing to assert its claims and is not the real party in interest. ECF No. 52. Defendants failed to raise this argument in their opening briefs. *See* ECF

11

### ii. Count III—Violation of the Defend Trade Secrets Act of 2016 (Against All Defendants)

Plaintiff's claim in Count III alleges violations of the Defend Trade Secrets Act ("DTSA") against L. Cortorreal, R. Cortorreal, and The Eagles Team. Plaintiff alleges that it shares its Confidential Information with its franchisees. Am. Compl. ¶¶ 91–92. The Confidential Information implicates interstate commerce as it is used to prepare taxes in each state that are transmitted to the Internal Revenue Service in Washington, D.C. *Id.* Additionally, Plaintiff argues that it has spent twenty-seven years compiling its customer lists, from which it derives independent economic value, including its operational methods and Confidential Information. *Id.* ¶¶ 93–96. Plaintiff also argues that it has taken extensive measures to protect its Confidential Information. *Id.* ¶ 100. Plaintiff contends "L. Cortorreal agreed under the Termination Agreements to never use, disclose, or permit the use or disclosure of Liberty's Confidential Information, and would return all customer information and Liberty's confidential Operations Manual to Liberty;" however, L. Cortorreal has not done so and intentionally disclosed this information to R. Cortorreal and The Eagles Team for their economic benefit. *Id.* ¶¶ 101–02. Defendants argue that Plaintiff's trade secrets are too broad and cannot be considered Liberty's property. R. Cortorreal Mem. Supp. at 4; L. Cortorreal Mem. Supp. at 7; The Eagles Team Mem. Supp. at 4. Additionally, Defendants argue that Plaintiff has not alleged that any one of them received Liberty's Operations Manual. *Id.*

Under the DTSA, "[a]n owner of a trade secret that is misappropriated may bring a civil action . . . if the trade secret is related to a product or service used in, or intended for use in,

---

Nos. 45, 46, 47. Thus, the Court declines to consider Defendants' new arguments as the arguments should have been raised in their opening briefs. *See Suchin v. Fresenius Med. Care Holdings, Inc.*, No. CV JKB-23-01243, 2024 WL 449322, at *4 (D. Md. Feb. 6, 2024) ("'The ordinary rule in federal courts is that an argument raised for the first time in a reply brief or memorandum will not be considered.'").

interstate or foreign commerce." 18 U.S.C. § 1836. The DTSA defines trade secret as "all forms and types of financial, business, scientific, technical, economic, or engineering information" that the owner "has taken reasonable measures to keep such information secret" and derives independent economic value. 18 U.S.C. § 1839(3). Thus, Plaintiff must allege: (1) it owns a trade secret; (2) the trade secret was misappropriated; and (3) the trade secret implicates interstate or foreign commerce. *Space Sys./Loral, LLC v. Orbital ATK, Inc.*, 306 F. Supp. 3d 845, 853 (E.D. Va. 2018).

First, the Amended Complaint satisfies the first element. Plaintiff's Amended Complaint provides factual descriptions of the Trade Secrets and Confidential Information, including its customer lists, operational methods, marketing strategies, training materials, and its relation to facilitating the tax business that Plaintiff spent twenty-seven years developing. Am. Compl. ¶¶ 20, 93. Moreover, Plaintiff pleads that it took extensive measures to keep this information private, including marking the information confidential and implementing protective measures to prevent disclosure. *Id.* ¶¶ 98, 100. Plaintiff also pleads that it derived independent economic value from the documents being kept secret because they contained information to generate business, which if disclosed, would create an unfair competition advantage. *Id.* ¶¶ 94–96; *see also Hawkins v. Fishbeck*, 301 F. Supp. 3d 650, 657 (W.D. Va. 2017) (finding that the trade secrets the plaintiff sufficiently described derived independent economic value where it included "pricing and service delivery planning and decisions . . . and work in progress with outside software development firms.").

Second, Plaintiff sufficiently pleads that Defendants misappropriated the trade secrets. Misappropriation means "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or disclosure or use of

a trade secret of another without express or implied consent . . . ." 18 U.S.C. § 1839(5). The

discloser either:

> (i) used improper means to acquire knowledge of the trade secret;
> (ii) knew or had reason to know that the knowledge of the trade secret was
>> (I) derived from or through a person who had used improper means to acquire the trade secret;
>> (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or
>> (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or before a material change of the position of the person, knew or had reason to know that the trade secret was a trade secret; and knowledge of the trade secret had been acquired by accident or mistake;

*Id.*

Here, Plaintiff alleges that it disclosed its Trade Secrets and Confidential Information to L.

Cortorreal pursuant to the Franchise Agreements, and upon termination, L. Cortorreal must return

this information to Plaintiff. Am. Compl. ¶¶ 99, 101. Plaintiff alleges that instead, L. Cortorreal

disclosed this information to R. Cortorreal and The Eagles Team for their own economic benefit.

*Id.* ¶ 102. Plaintiff also alleges that Defendants sent text messages to Plaintiff's customers to solicit

them for business and has been preparing taxes for Plaintiff's former clients. *See Id.* ¶¶ 61–62.

Further, Plaintiff alleges that "Defendants have used and/or disclosed Liberty's Confidential

Information . . . without Liberty's permission or authorization, with [the] knowledge that they did

not have permission or authorization to use said Confidential Information." *Id.* ¶ 103. These facts,

taken as a whole, are sufficient to plausibly allege that Defendants misappropriated Plaintiff's

Trade Secrets. The facts also support an inference of disclosure through improper means and at

the least Defendants "knew or had reason to know that the trade secret was a trade secret."

14

Third, Plaintiff sufficiently demonstrates that the trade secrets implicate interstate commerce because the trade secrets relate to tax information transmitted from each state to the Internal Revenue Service in Washington, D.C. Am. Compl. ¶ 92.

Because the Court has subject matter jurisdiction and Plaintiff states a plausible claim under Count III, Defendants' Motions to Dismiss Count III is denied.

**B. Supplemental Jurisdiction**

In cases where district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. 28 U.S.C. § 1367(a). According to the Supreme Court, "once a district court had valid jurisdiction over a federal claim, it could, in its discretion, exercise supplemental jurisdiction over additional state claims if they arose out of 'a common nucleus of operative fact' such that the plaintiff would ordinarily be expected to try the claims in one judicial proceeding." *White v. Cnty. of Newberry, S.C.*, 985 F.2d 168, 171 (4th Cir. 1993); *see also United Mine Workers v. Gibbs,* 383 U.S. 715, 725 (1966). Since the Court has subject matter jurisdiction, the Court will use its discretion to exercise supplemental jurisdiction to address the state law claims and will apply Virginia law in addressing those claims.

**i. Count I & II—Breach of Contract (Equitable Claim) (Against L. Cortorreal) and Breach of the Franchise Agreements (Monetary Claim) (Against L. Cortorreal)**

Plaintiff's claim in Count I alleges breach of contract against L. Cortorreal, seeking a preliminary injunction. Plaintiff's claim in Count II alleges breach of contract against L. Cortorreal, seeking monetary damages. Since Plaintiff's claims in both Counts are for breach of contract, the Court will consolidate its breach of contract analysis.

15

In this case, Plaintiff alleges that under the Franchise Agreements, L. Cortorreal agreed to:

> (a) return Liberty's confidential Operations Manual; (b) refrain from using or disclosing Liberty's Confidential Information; (c) refrain from directly or indirectly offering tax preparation services and soliciting Liberty's customers within twenty-five (25) miles of his former Liberty offices through January 23, 2024; and (d) not engage in acts that are harmful to Liberty.

Am. Compl. ¶ 74. L. Cortorreal also agreed to "pay all amounts due and owing to Liberty in connection with the Franchise Agreements, including amounts due under the Notes." *Id.* ¶ 84. Further, Plaintiff argues that L. Cortorreal breached the Franchise Agreements and the breaches have sown confusion among its customers. *Id.* ¶¶ 76–78. However, L. Cortorreal argues that he is not the franchisee, and he did not sign or guarantee the Notes. L. Cortorreal Mem. Supp. at 4–5. Additionally, L. Cortorreal argues that he has no continuing obligations to Liberty because the allegations of an agreement between L. Cortorreal and Liberty are contradicted by Liberty's termination letter to Alamo and Melgar. *Id.* at 6.

To state a claim for breach of contract in Virginia, a plaintiff must show (1) a legally enforceable contract between the plaintiff and the defendant; (2) the defendant's violation or breach of contract; and (3) an injury or harm to the plaintiff caused by the defendant's breach. *Navar, Inc. v. Federal Business Council*, 291 Va. 338, 344 (2016). A legally enforceable contract requires an offer, acceptance, and valuable consideration. *Montagna v. Holiday Inns, Inc.*, 221 Va. 336, 346 (1980).

At the motion to dismiss stage, the Court considers whether the Amended Complaint alleges sufficient facts that there was a legally enforceable contract. According to the Amended Complaint, Plaintiff alleges that L. Cortorreal agreed to the terms under the Franchise Agreements and signed the Franchise Agreements. *See* Am. Compl. Ex. A at 29, Ex. B at 29. Although the Franchise Agreements list Alamo and Melgar as the "Franchisee," L. Cortorreal agreed that "[t]he

16

individual signators signing on behalf of Franchisee also agree jointly and severally to perform all the obligations in and relating to this Agreement . . . ." Am. Compl. Ex. A at 28, Ex. B at 28. These facts are sufficient to indicate an offer, acceptance, and consideration to support a legally enforceable contract.

The Court also finds that the other two elements of a breach of contract claim were also sufficiently pled. Am. Compl. ¶ 78–80, 88. Based on the allegations in the Amended Complaint, the Court finds that Plaintiff alleged sufficient facts to state a claim for breach of contract. Thus, L. Cortorreal's Motion to Dismiss Counts I and II is denied.

### ii. Count IV—Unjust Enrichment (Against all Defendants)

Plaintiff's claim in Count IV alleges unjust enrichment against Defendants. Plaintiff argues that it "conferred a benefit on L. Cortorreal and R. Cortorreal by disclosing the Trade Secrets and Confidential Information to them." Am. Compl. ¶ 109. Further, Plaintiff argues that Defendants have been enriched by the disclosure and are not entitled to use the Confidential Information. *Id.* ¶ 110–11. Defendants also have retained the information for their own benefit without paying for its value. However, R. Cortorreal argues that there is no allegation that R. Cortorreal engaged in fraud or unfair advantage, and there is no allegation that Plaintiff provided any property or money to R. Cortorreal. R. Cortorreal Mem. Supp. at 4. L. Cortorreal argues that there is no allegation that he engaged in fraud, duress, or unfair advantage, and no allegation to support that there was consideration provided for the Notes. L. Cortorreal Mem. Supp. at 7. The Eagles Team argues that there is no allegation that The Eagles Team engaged in fraud, duress, or unfair advantage, and there is no allegation that The Eagles Team had any relationship or communication with Plaintiff. The Eagles Team Mem. Supp. at 4.

Unjust enrichment is a contract implied in law "requiring one who accepts and receives goods, services, or money from another to make reasonable compensation for those services." *James G. Davis Constr. Corp. v. FTJ, Inc.*, 298 Va. 582, 591 (2020). "It arises from the simple principle that one person may not 'enrich himself unjustly at the expense of another.'" *Id.* (quoting *Rinehart v. Pirkey*, 126 Va. 346, 351 (1919)). To plead unjust enrichment, a plaintiff must allege that: (1) he conferred a benefit; (2) defendant knew of the benefit and should reasonably have expected to repay plaintiff; and (3) defendant accepted or retained the benefit without paying for its value. *Schmidt v. Household Fin. Corp., II*, 276 Va. 108, 116 (2008). "One may not recover under a theory of implied contract simply by showing a benefit to the defendant, without adducing other facts to raise an implication that the defendant promised to pay the plaintiff for such benefit." *Nedrich v. Jones*, 245 Va. 465, 476 (1993). However, under Virginia law, "a plaintiff cannot simultaneously recover in contract and in equity (*i.e.* quasi-contract)." *McPike v. Zero-Gravity Holdings, Inc.*, 280 F. Supp. 3d 800, 809 (E.D. Va. 2017). At the pleading stage, it makes sense for a plaintiff "to plead quasi-contractual claims in the alternative when the applicability or enforceability of the contract is in dispute, the rationale for alternative pleading disappears when neither party contests the applicability or validity of the contract." *Id.* at 310 (internal citations omitted).

Since unjust enrichment is appropriate in the absence of an enforceable contract and Plaintiff sufficiently pleaded a breach of contract claim against L. Cortorreal, Plaintiff is precluded from claiming unjust enrichment in the alternative.

Plaintiff also claims unjust enrichment against R. Cortorreal. Plaintiff has not sufficiently pleaded any of the elements of unjust enrichment against R. Cortorreal, which is fatal to this claim. While Plaintiff may have conferred a benefit on L. Cortorreal, there is no factual support to show

18

that Plaintiff conferred a benefit on R. Cortorreal or that he knew of the benefit and should have reasonably expected to repay Plaintiff. The bare allegation that L. Cortorreal and R. Cortorreal are related is not enough to support that R. Cortorreal knew that he had to repay Plaintiff anything, especially since R. Cortorreal did not sign the Franchise Agreements.

Lastly, Plaintiff sufficiently claims unjust enrichment against The Eagles Team. Regarding the first element, Plaintiff conferred a benefit on The Eagles Team through its member, L. Cortorreal. *See* Am. Compl. ¶ 12. L. Cortorreal signed the Franchise Agreements and received Liberty's Trade Secrets and Confidential Information to operate a Liberty franchise. Second, L. Cortorreal knew of the benefit and per the terms of the Franchise Agreements, he should have returned the Trade Secrets and Confidential Information to Liberty. Third, L. Cortorreal retained Liberty's Trade Secrets and Confidential Information without compensating Liberty and used this information to operate The Eagles Team. Thus, at this stage, Plaintiff sufficiently pleads unjust enrichment against The Eagles Team.

Accordingly, Plaintiff's claim in Count IV is dismissed against L. Cortorreal and R. Cortorreal. However, The Eagles Team Motion to Dismiss Count IV is denied.

### iii. Count V—Conversion (Against All Defendants)

Plaintiff's claim in Count V alleges conversion against L. Cortorreal, R. Cortorreal, and The Eagles Team. Plaintiff alleges that it owns and has the right to possess its customer information and Operations Manual (collectively, the "Property"). Am. Compl. ¶ 116. L. Cortorreal and R. Cortorreal were authorized to use and possess the Property while operating a Liberty franchise, but The Eagles Team did not have authorization. *Id.* ¶ 117–18. Upon termination of the Franchise Agreements, L. Cortorreal and R. Cortorreal were required to return Liberty's Property; however, Defendants have maintained control over the Property and converted the Property for their

financial gain, which deprived Liberty of its possession and use of the Property. *Id.* ¶¶ 119–22. Additionally, Plaintiff argues that it suffered damages and will continue to suffer until Defendants return the Property to Liberty. *Id.* ¶ 123. However, Defendants argue that Plaintiff fails to plead a cause of action for conversion. R. Cortorreal Mem. Supp. at 5; L. Cortorreal Mem. Supp. at 7–8; The Eagles Team Mem. Supp. at 4–5.

Under Virginia law, conversion is "any wrongful exercise or assumption of authority . . . over another's goods, depriving him of their possession; [and any] act of dominion wrongfully exerted over [the] property in denial of the owner's right, or inconsistent with it." *United Leasing Corp. v. Thrift Ins. Corp.*, 247 Va. 299, 305 (1994) (internal citation and quotation marks omitted). A cause of action for conversion applies to tangible property only. *Id.* "However, many courts have recognized the tort of conversion in cases where intangible property rights arise from or are merged with a document, such as a valid stock certificate, promissory note, or bond." *Id.* "Nevertheless, a cause of action for conversion does not encompass claims for interference with *undocumented* intangible property rights." *Id.* at 306.

Here, the Court finds that Plaintiff sufficiently pleads a cause of action for conversion against Defendants. Plaintiff provided L. Cortorreal with its Trade Secrets and Confidential Information to operate as a Liberty franchise. However, upon termination of the Franchise Agreements, L. Cortorreal took possession of Plaintiff's Property and failed to return it. L. Cortorreal instead used Plaintiff's Property without Plaintiff's permission to operate The Eagles Team along with R. Cortorreal. Although Defendants argue that the property must be tangible, courts have recognized a cause of action for conversion in cases where intangible property is at issue. *See, e.g.*, *United Leasing Corp.*, 247 Va. at 440; *see also Combined Ins. Co. of Am. v. Wiest*, 578 F. Supp. 2d 822, 834 (W.D. Va. 2008) ("[A] confidential list sent to the defendant's email

account—is intangible."). Additionally, it does not matter that R. Cortorreal did not contractually agree with Liberty to refuse to perform tax services subject to the non-compete provision because any innocent third party receiving the benefit of the traceable Property can be liable for conversion. *Cf., Fed. Ins. Co. v. Smith*, 63 F. App'x 630, 639 (4th Cir. 2003) ("any innocent third party receiving the benefit of that 'traceable' money might be liable for conversion and compelled to pay it back."). Thus, Defendants' Motions to Dismiss V are denied.

### iv. Count VI—Tortious Interference with Franchise Agreements and Business Relationships) (Against R. Cortorreal and The Eagles Team)

Plaintiff's claim in Count VI alleges tortious interference against R. Cortorreal and The Eagles Team. Plaintiff is seeking an injunction to prevent further interference with the Franchise Agreements and its business relationships. Plaintiff alleges that The Eagles Team and R. Cortorreal had knowledge of the Franchise Agreements through its member, L. Cortorreal. Am. Compl. ¶¶ 126–27. Further, The Eagles Team and R. Cortorreal knowingly interfered with the Franchise Agreements and Liberty's existing relationships with its customers, which has caused Liberty harm. *Id.* ¶¶ 128–31. R. Cortorreal and The Eagles Team argue that Plaintiff fails to plead tortious interference because there is no valid contract, no evidence that they willfully interfered with the contract, and no evidence that they caused Plaintiff harm. R. Cortorreal Mem. Supp. at 6; The Eagles Team Mem. Supp. at 6.

In Virginia, the elements of a tortious interference claim are: "1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy . . . ; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted." *Schaecher v. Bouffault*, 290 Va. 83, 106 (2015).

Here, Plaintiff pleads a cause of action for tortious interference. First, Plaintiff alleges the existence of a contractual relationship between L. Cortorreal and Liberty. Second, R. Cortorreal knew of the relationship between L. Cortorreal and Liberty. Additionally, The Eagles Team knew about L. Cortorreal's relationship with Liberty because L. Cortorreal is a member of The Eagles Team. Critically, it is plausible that R. Cortorreal and The Eagles Team had knowledge of L. Cortorreal's use of Plaintiff's Trade Secrets and Confidential Information as The Eagles Team sent text messages to Liberty's former customers thereby intentionally interfering with the contract. *See* Am. Compl. ¶ 61 ("We are contacting you from The Eagles Team! We are happy to inform you [that] we have separated from Liberty Tax Service where you used to file your income tax[es]."). Fourth, Plaintiff suffered economic damages because L. Cortorreal chose to not honor the post-termination contractual obligations. Thus, R. Cortorreal and The Eagles Team's Motions to Dismiss Count VI are denied.

## C. Injunctive Relief

To obtain an injunction, Plaintiff must establish that: "(1) [it is] likely to succeed on the merits, (2) [it is] likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in [its] favor, and (4) an injunction is in the public interest." *ICENY USA, LLC v. M & M's, LLC*, 421 F. Supp. 3d 204, 213 (D. Md. 2019). A preliminary injunction is an extraordinary remedy and it "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* (internal citation and quotation marks omitted).

As an initial matter, the Court first addresses whether it may enter a preliminary injunction when neither party filed a motion for a hearing or a memorandum in opposition to injunctive relief. Federal Rule 65(a) provides that a court "may issue a preliminary injunction only on notice to the adverse party." A preliminary injunction only binds those who receive actual notice of it,

22

specifically "the parties, the parties' officers, agents, servants, employees, and attorneys, and other persons who are in active concert or participation with anyone described in Rule 65(d)(2)(A) or (B)." Fed. R. Civ. P. 65(d)(2). "To comport with due process and the requirements of Rule 65, courts generally require the adverse party to have notice and an opportunity to be heard, ideally through formal service of process and actual notice that a preliminary injunction might issue." *ICENY USA, LLC*, 421 F. Supp. at 213 (quoting *Gilchrist v. Gen. Elec. Capital Corp.*, 262 F.3d 295, 301 (4th Cir. 2001)).

Here, Plaintiff has not specified whether it provided notice to Defendants. The Court now construes Plaintiff's request as seeking an ex parte preliminary injunction. However, Rule 65(a)(1) is clear that no preliminary injunction may issue without notice to the adversary party. Even if the Court construes Plaintiff's request as seeking an ex parte temporary restraining order, Plaintiff still has not comported with the requirements of Rule 65(b)(1). Consequently, Plaintiff fails to address the issue of notice. Thus, Plaintiff cannot obtain a preliminary injunction without providing notice to Defendants and a hearing on the matter.

Accordingly, at this stage, Plaintiff's request is dismissed.

## III. CONCLUSION

Based on the foregoing reasons, the Defendants' Motions to Dismiss is **GRANTED IN PART and DENIED IN PART.** ECF Nos. 42, 43, 44. The Court **GRANTS** L. Cortorreal and R. Cortorreal Motions to Dismiss Count IV and the Court **DENIES** The Eagles Team Motion to Dismiss Count IV. *Id.* The Court **DENIES** Defendants' Motions to Dismiss all the other Counts. The Court **DISMISSES** Plaintiff's request for an injunction as it is procedurally improper. ECF No. 40.

The Court **DIRECTS** the Clerk to provide a copy of this Order to the parties.

**IT IS SO ORDERED.**

Norfolk, Virginia
August 23, 2024

Raymond A. Jackson
United States District Judge

24